KING et al. v. SIMMONS et al.

(Supreme Court, Appellate Division, First Department. December 30, 1898.)

1. FRAUDULENT CONVEYANCES—CONSIDERATION—EVIDENCE.

The consideration for a transfer of goods alleged to have been in fraud of creditors was $10,000. Previous to the sale the goods were appraised at $12,000. The debtor, who executed the transfer, put their value at about $75,000, but his bookkeeper who had charge of the books gave figures fixing their approximate value at $13,000. The goods sold at auction for $11,500. *Held*, that the consideration was adequate.

2. SAME.

An insolvent attempted to sell his stock to a creditor, who declined to buy, but procured an auctioneer to purchase it for $10,000, with money furnished by the creditor, he reserving an amount sufficient to pay his debt. The balance was paid to the debtor, who distributed it among

various creditors. The stock was sold at public auction, which was fairly conducted, for $11,500. The auctioneer deducted his commission, and remitted the balance to such creditor. *Held*, that the transfer was not fraudulent as to creditors.

3. SAME—EVIDENCE OF FRAUD.

The fact that a creditor who purchased his debtor's stock, which he sold at auction, guarantied the bill of a purchaser, is not evidence of fraud, since, as he acquired title by the original bill of sale, he could reserve any part of the goods he desired.

4. SAME.

Where a creditor purchased his debtor's stock exclusive of fixtures, the fact that the fixtures, which remained in the debtor's possession, were included in the bill of sale by mistake, is not evidence of fraud, since they were subject to execution by any creditor.

Appeal from special term, New York county.

Action by Bennett J. King and others against Jacob Simmons and others to set aside a bill of sale as fraudulent. From a judgment for plaintiffs, defendants appeal. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and INGRAHAM, JJ.

A. Stern, for appellant Thomas R. Manners.
Samuel Greenbaum, for appellant Adolph Friedman.
Alex. Blumenstiel, for respondents.

BARRETT, J. The judgment appealed from sets aside, as against the plaintiffs, judgment creditors of the firm of J. Simmons & Co., a bill of sale made by that firm to the defendant Friedman, on or about November 24, 1896, of all the stock and fixtures in their store, No. 734 Broadway, New York City. The facts leading up to the execution of the instrument are few and simple. The firm of Simmons & Co., being in financial straits, attempted to dispose of its stock to the defendant Manners. Manners declined to buy, but said that Friedman might. Negotiations followed. The goods were appraised. They were purchased, and $10,000 was paid for them. Manners furnished the money, and, as it would seem, guarantied Friedman against loss. This simple and natural account of the transaction is established by the testimony of at least six witnesses,—the defendants Friedman and Manners, their employés Young and Frankel, and the attorneys Myers and Bronner. Opposed to it is a very improbable story told by the witness Simmons, one of the members of the transferring firm. He says that he meant to execute a general assignment to the Union Square Bank, to which he owed $10,000; that he was urged not to do this, the argument against it being that, in view of this indebtedness, the bank would give him no new consideration, while Manners, who was equally responsible, would pay him $10,000; and that he finally agreed to make the assignment to Manners. His illiteracy is relied upon to explain why he failed to discover that the paper was not a general assignment, and that it was made to Friedman, not to Manners. The question at once presents itself, why should Simmons have supposed that a general assignee would pay Simmons & Co. $10,000? No satisfactory explanation is, or could well be, given. In addition to making this payment, Manners agreed,

if we may believe Simmons, to pay the firm's debts in excess of this sum. This story is highly improbable in itself, and, in spite of a certain amount of corroboration from Simmons' wife, cannot stand for a moment against the evidence to the contrary.

Treating the transaction as what it really was,—a sale of the goods outright to either Friedman or Manners,—the first and most important question is whether the consideration was fairly adequate. As to the value of the goods, Simmons' testimony is again at variance with all the other evidence. He gives his opinion that the stock sold was reasonably worth $70,000 to $80,000, and says that an inventory taken at the end of October, 1896, showed goods to that amount. This testimony does not harmonize with Simmons' other statement that the assignment was not made to the bank because he already owed it $10,000, and hence could obtain no advance upon the goods to be so assigned to that institution. But the evidence to show that he was mistaken was clear. The goods were appraised just before the sale for $12,000 or under. The testimony of Frankel, Simmons' bookkeeper, seems quite conclusive upon the question of value. Simmons admits that Frankel had full charge of the books, and that he himself made no entries therein. Frankel gives the figures in detail. They show that the goods on hand in January, 1896, and those subsequently bought, up to November 24, 1896, amounted to $97,183.76; that of these $69,112.49 were sold; that to the balance, $28,071.27, should be added $10,000 for cost of manufacture; and that from the resulting $38,071.27 should be deducted $19,600 for goods pledged to creditors, and $5,484 as the value of fixtures included in the merchandise account. The balance—something less than $13,000—was thus the value of the goods transferred to Friedman. We find nothing to rebut these figures. Simmons' testimony has, in fact, when analyzed, but little probative force. He does not give the amount of sales subsequent to the October inventory, nor does he make any allowance for the amount of goods pledged to creditors, which evidently increased in amount as the firm neared the period of insolvency. We have, on the other hand, testimony of a salesman of the firm that the most valuable part of the stock on hand on November 8th disappeared between that date and November 21st. The consideration for the transfer was, therefore, fairly adequate. As to the disposition of this consideration, the evidence shows that it was untainted with fraud. The facts as to the payment and disposition of the money are these: Manners reserved $1,000 to pay a debt due to him by Simmons & Co., $500 was paid to the attorneys, and the balance was given to Simmons in cash. There is no question as to the existence and bona fides of the debt due to Manners, and, although the bill of the attorneys upon which this payment was made upon account appears to be exorbitant, yet the payment of $500 does not seem to be seriously questioned. Simmons distributed substantially all of the remaining $8,500 among various creditors. Friedman, who was an auctioneer, resold the goods in the early part of December, 1896. The sale was advertised in four newspapers, and 500 postal cards were sent out to his regular customers. In every respect the sale seems to have been fair and open. The goods brought but $11,·

501.98.   Of this Friedman retained $920.95 for his auctioneer's fees, and remitted the balance to Manners.   The latter thus made a gross profit of $581.03.  · He says his net profit was only between $400 and $500.   At the sale one Watson bought about $1,100· worth of goods, and Manners guarantied the bill.   Some of these goods were in fact taken by Manners.

We have examined this whole transaction carefully, but fail to find any substantial evidence of fraud.   Manners, we will assume, as principal, made the purchase.   Friedman sold for him the goods so purchased, taking his commission, and remitting the balance.   So far as Friedman is concerned, he seems simply to have charged his regular fees as auctioneer, and Manners' profit certainly cannot be deemed excessive in view of the amount of money risked and the labor involved.   There is absolutely no evidence to show that Simmons ever got a dollar more out of the transaction than the $10,000 originally paid him.   This being so, what motive had he to sacrifice the goods?  There was no corrupt agreement between Manners and himself to permit him to secrete from his creditors the $10,000 received, or any part of it.   Not only is there no evidence of that kind, but it appears, as we have seen, that Simmons used substantially all of the money to pay his creditors.   The transaction, except as a means to this end, seems absolutely motiveless.

Stress is laid upon the fact that Manners bought in some of the goods, upon the resale, in the name of Watson.   As he acquired title by the original bill of sale, he might have reserved any part of the goods he chose.   The fact can be of value to the plaintiffs only as it tends to show that a fair price was not realized upon the resale.   But there is no evidence that these goods did not bring a fair price.   In fact this action on the part of Manners rather tends to prove that he did not wish the goods to be sacrificed, and, in view of the public nature of the sale, it is difficult to see how Watson could have prevented the goods from bringing a fair price.

Fraud is also claimed because the fixtures were included in the bill of sale, but were retained by Simmons & Co.   There was evidently a mistake here in drafting the instrument.   The fixtures did not enter into the negotiations, and neither Manners nor Friedman has ever taken possession of or laid claim to them.   They were not, in fact, purchased; and they remained openly in the possession of Simmons & Co., subject to the execution of any creditor.   No creditor could have been hindered, delayed, or defrauded by this harmless error of the draftsman, unacted upon by any of the parties to the instrument.

Many other considerations are adverted to in the elaborate brief of the counsel for the plaintiffs, but we do not think that they bear materially upon the essential and crucial facts.   Fraud has not been made out in this case, either by direct evidence of a credible kind or by just inference from the circumstances disclosed.   The judgment really rests upon conjecture; certainly upon nothing graver than suspicion.   We think, therefore, that it should be reversed, and a new trial ordered, with costs to each of the appellants to abide the event. All concur.